David Bilodeau                                    2891 Motions for Claim.
1050-1 Gilles-Hocquart                            Proof of Claim # 14119
Boucherville, Québec, Canada
J4B 8J6
Tel: 450-449-1598

4218698 Canada Inc. / David Bilodeau              2892 Motions for Claim.
1050-1 Gilles-Hocquart                            Proof of Claim # 14117
Boucherville, Québec, Canada
J4B 8J6
Tel: 450-449-1598

9016-2355 Québec Inc. / René Bilodeau             2893 Motions for Claim.
1050-1 Gilles-Hocquart                            Proof of Claim # 14118
Boucherville, Québec, Canada
J4B 8J6
Tel: 450-449-1598

**Claimants for Administrative Expenses
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**



In re: Refco et al. Debtors.
**Chapter 11
Case No. 05-60006 (RDD)**

### THE CLAIMANTS APPEAL UNDER 28 U.S.C. 158 (a) or (b) FROM THE ORDER OF THE BANKRUPTCY JUDGE, HONORABLE ROBERT D. DRAIN, TO DISALLOW OUR REQUESTS FOR PAYMENT OF ADMINISTRATIVE CLAIMS RELATED TO POST PETITION INCREASE IN THEIR FXA CLIENT ACCOUNT BALANCES

Signed: _____        Signed: _____
David Bilodeau                            4218698 Canada Inc. / David Bilodeau

Signed: _____
9016-2355 Québec Inc. / René Bilodeau

Dated: May 9, 2007.

1

| | |
|---|---|
| **David Bilodeau**<br>1050-1 Gilles-Hocquart<br>Boucherville, Québec, Canada<br>J4B 8J6<br>Tel: 450-449-1598 | **2891 Motions for Claim.**<br>**Proof of Claim # 14119** |
| **4218698 Canada Inc. / David Bilodeau**<br>1050-1 Gilles-Hocquart<br>Boucherville, Québec, Canada<br>J4B 8J6<br>Tel: 450-449-1598 | **2892 Motions for Claim.**<br>**Proof of Claim # 14117** |
| **9016-2355 Québec Inc. / René Bilodeau**<br>1050-1 Gilles-Hocquart<br>Boucherville, Québec, Canada<br>J4B 8J6<br>Tel: 450-449-1598 | **2893 Motions for Claim.**<br>**Proof of Claim # 14118** |

**Claimants for Administrative Expenses**
**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**



In re: Refco et al. Debtors.
Chapter 11
Case No. 05-60006 (RDD)

## THE CLAIMANTS APPEAL UNDER 28 U.S.C. 158 (a) or (b) FROM THE ORDER OF THE BANKRUPTCY JUDGE, HONORABLE ROBERT D. DRAIN, TO DISALLOW OUR REQUESTS FOR PAYMENT OF ADMINISTRATIVE CLAIMS RELATED TO POST PETITION INCREASE IN THEIR FXA CLIENT ACCOUNT BALANCES

Signed: _[signature]_  Signed: _[signature]_
David Bilodeau    4218698 Canada Inc. / David Bilodeau

Signed: _[signature]_
9016-2355 Québec Inc. / René Bilodeau

Dated: May 9, 2007

1

**Note: REFCOFX, Refco F/X, RFX, FXA appellations that you can read in this Appeal document always refer to the same entity.**

### Pre-petition Facts

1.  RFA (REFCOFX) was serving +/- 15 000 retail clients

### Criminal Fraud Allegation

2.  On the week of October 10, 2005 many REFCOFX Account Holders (including ourselves) asked throughout the REFCOFX Customer Service Chat Room if it could be possible to lose their money if REFCO would go into a bankruptcy process (EXHIBIT 1 & 2).

3.  On the week of October 10, 2005, REFCOFX Customer Service people, throughout the REFCOFX Chat Room, answered to the REFCOFX Account Holders (including the claimants) that the only way to lose their money was either to make bad trades or if Bank of America filed for bankruptcy (EXHIBIT 1 & 2)..

4.  The Claimants allege that in the meantime that REFCOFX Customer Service people, throughout the REFCOFX Chat Room, answered to the REFCOFX Account Holders (under directives received from REFCOFX management people) that the only way to lose their money was either to make bad trades or if Bank of America filed for bankruptcy, REFCOFX was transferring on October 12, 2005 many millions $ from REFCOFX account(s) to other REFCO account(s) with the intent to give more money to more important creditors as shown on the report named "Timeline of transfers between certain REFCO accounts" (EXHIBIT 3).

5.  The Claimant has received a copy of an email (EXHIBIT 4) sent by Mr. Drew Niv* (FXCM CEO) to one of the REFCOFX Account Holders member of the Refco Account Holders Legal Fund (Norma Lavigne) on March 27, 2007, who said... "Refco lawyers declared in October 2005 that these funds were not customer funds they were biased as they were serving the then existing board of directors (their client) which were mostly directors from TH LEE the LBO fund. The LBO fund lives on its relationship with banks and other large creditors so it can go around doing more LBOs. As Refco's true assets disappeared in the fraud the only ones left were customer funds and if Refco attorneys had not made the call they did the banks would be getting 20 cents on the dollar now and TH LEE would be out of the LBO business. TH LEE board members and others were only removed spring of 2006 after outcry from US justice department who threatened to appoint its own trustee of Refco if the board would not resign." Background about Drew Niv (FXCM CEO). FXCM was own at 35% by REFCOFX and make a BID over 130 Million dollars to acquire REFCOFX. REFCOFX used prepetition and postpetition the FXCM platform to trade (for more details see EXHIBIT 10 page 5-10 items 8 – 15).

6.  The Claimants allege that REFCOFX & REFCO have misused the "Collateral and Lending Agreement" item (item 6. page 3 of the REFCOFX Client Agreement - EXHIBIT 5) in the REFCOFX Client Agreement to transfer illegally

2

many millions $ to other REFCO subsidiary account(s) with the intent to give more money to more important creditors as mentioned in the email from

7. Drew Niv (FXCM CEO) (EXHIBIT #4) and shown on the report named "Timeline of transfers between certain REFCO accounts" (EXHIBIT 3).

8. The last sentence of the "Collateral and Lending Agreement" item in the REFCOFX Client Agreement (EXHIBIT 5) clarifies this important item "The purpose of the Lending Agreement is to allow RFXA (REFCOFX) to use the currencies, property, depository receipts as collateral".

9. Collateral within a financial context is used to indicate assets that secure a debt obligation. For example, in the case of a mortgage, the house serves as the collateral for the mortgage loan. This way, the bank is secured against the default risk of the borrower not being able to meet the interest payments. In case of default, the bank can sell the house and get its money (or at least a part of it) back.

10. Collateral, especially within banking, may traditionally refer to secured lending (also known as asset-based lending) as well as more recently as collateralisation arrangements to secure trade transactions (also known as *capital market collateralization*). The former often presents unilateral obligations, secured in the form of property, surety, guarantee or other as collateral (originally denoted by the term *security*), whereas the latter often presents bilateral obligations secured by more liquid assets such as cash or securities, often known as margin.

11. The Claimants allege that REFCOFX Account Holders funds (except those required for reasonable hedging activity (collateral)) and other REFCOFX funds should have stayed in the REFCOFX account(s) for eventual REFCOFX creditors' distribution benefit.

12. The Claimants allege in the event that some improper REFCOFX Account Holders funds were transferred to other REFCO account(s) without any reasonable hedging activity purpose and furthermore if other REFCOFX owned funds were transferred to other REFCO account(s) without fair business reasons, the people or organizations involved in those REFCOFX Account Holders funds transfers to other REFCO account(s) without any reasonable hedging activity or fair business reasons, are guilty of a breach of fiduciary duty and breach of a duty of loyalty and trust, furthermore they are guilty of Criminal Fraud since REFCOFX Account Holders, as creditors, have been deprived of those funds distribution under the actual REFCOFX Chapter 11.

3

13. If we can prove this Criminal Fraud, Criminal Fraud action should be taken against REFCOFX Management, REFCO Management people and all other organizations or other people (if applicable TH Lee LBO Fund, REFCO attorneys, Skadden, Arps) involved if such illegal REFCOFX funds transfers to other REFCO account(s).

14. According to the records of RCM and based upon the admission by REFCOFX post petition, REFCOFX transferred customer monies to RCM in order to earn higher interest rates on such money. As of the petition date, RCM owed and still owes a net amount to REFCOFX equal to $83,379,040 (the "FX Receivable").

15. We have to clarify where this $83,379,040 is coming from. How many dollars were coming from own REFCOFX assets? What was the amount that should be reasonably transferred for hedging (collateral purpose) for REFCOFX trading activities (if required)? What was the extra amount coming from REFCOFX account(s) without any relation to hedging "collateral" purpose?

16. Timeline of those REFCOFX funds transfers to other REFCO account(s) is critical information as it can establish the fraudulent intent of the decision makers (EXHIBIT 3).

17. REFCOFX & REFCO state these millions $ were transfers to other REFCO account(s) to allow REFCOFX to do Hedging activity, the claimants would like to verify the validity of this allegation.

18. Since REFCOFX has given wrongful answers about the security of their funds to REFCOFX Account Holders on the days preceding the filing for Chapter 11, the Claimants can have reasonable doubts about the integrity of REFCOFX and other REFCO entities regarding the real intent of these REFCOFX millions $ transferred to other REFCO account(s) which was supposed to be used by REFCOFX to do Hedging activity.

19. The only way that we can verify the validity of the real use of the millions $ transferred to other REFCO account(s) is to closely check the monthly REFCOFX Financial Statements, showing from the beginning of REFCOFX operations until October 17, 2005, this check will establish the real amount of money usually required to allow REFCOFX to do Hedging activity, that should furthermore establish the fraudulent intent of the decision makers to deprive REFCOFX creditors of fair distribution under Chapter 11.

20. We respectfully ask to the court to obtain from REFCOFX those monthly REFCOFX Financial Statements to closely check if the millions $ transferred to other REFCO account(s) to allow REFCOFX to do Hedging activity or other business reasons was really needed under its normal business activities.

21. Furthermore we respectfully ask the court to ask some hedging specialists what reasonable amount of money should have been required (under real REFCOFX business operations) to allow REFCOFX to do the Hedging activity.

22. We respectfully ask to the court to rule about these fund transfers from REFCOFX account(s) to other REFCO account(s), to confirm if those funds transfers in the days preceding the Chapter 11 filing were legal or not and if a Criminal Fraud has occurred.

23. The Claimants believe that it is very important for the court to rule about the funds transferred from REFCOFX account(s) to other REFCO account(s) to build a good understanding about all the circumstances around the Administrative Claims.

### Post-petion Facts

23. On October 18, the Claimants received an email from RefcoFX Staff (EXHIBIT # 6) informing them that..."RefcoFX Associates LLC (RefcoFx) was formally operating under Chapter 11 Bankruptcy protection, as of October 17/18, 205...."

24. On November 7, 2005, the Claimants acknowledged an Important Notice to RefcoFx clients throughout the RefcoFx Web site (EXHIBIT # 7) ..."There can be no assurance as to the timing or amount of any payments to customers from their accounts at RefcoFx. In addition, there can be no assurance as to wheter customers will be able to have access any gains from trading activity occurring after October 17, 2005. Any return of amounts in customer accounts is subject to the supervision and control of the United States Bankruptcy Court."

25. On November 11, 2005, the Claimants received an email from RefcoFX Staff (EXHIBIT # 8) informing them that..."We wanted you to know about an important step in Refco's Chapter 11 filing... The MOU provides for the transfer of more than 15,000 retail client accounts of RefcoFX.com, including yours, to an affiliate of FXCM.
Under the terms of the MOU:

- Pending completion of a transaction, RefcoFX clients may continue trading in their accounts without disruption, and
- Upon completion of a transaction, all retail customer positions and orders traded on the FX Trading Station platform will be transferred intact and RefcoFX account holders will be made whole, have access to 100% of their funds, and be able to carry out normal account procedures, including withdrawing funds, as usual.
We believe this is the first step in ultimately normalizing trading. The MOU must be approved by the Bankruptcy Court, and the sale of the business will occur through a court-supervised auction open to competing bids. Thus we expect the process to take approximately 30 days to
Complete.

5

26. On December 19, 2005, the Claimants received an email from RefcoFX Staff (EXHIBIT # 9)
...Dear Client,
We wanted you to know about an important step in Refco's Chapter 11 case.

Judge Robert Drain of the U.S. Bankruptcy Court for the Southern District of New York has approved bidding procedures to auction certain assets of Refco FX Associates LLC, including the company's more than 15,000 retail accounts.

Upon completion of the auction and sale of these assets, which we hope will occur in February, please note the following:

· All Refco FX customer positions and orders traded on the FX Trading Station platform will be transferred intact;

· Those Refco FX account holders will have access to 100% of their funds on deposit, net of their account trading activity since Oct. 17;

· Refco FX account holders will be able to carry out normal account procedures, including withdrawing funds, as usual.

Pending completion of a transaction, RefcoFX clients may continue trading in their accounts.

Refco FX has entered into an agreement to sell the assets to Forex Trading LLC and Forex Capital Markets LLC ("FXCM"), a Futures Commission Merchant registered with the CFTC and a member of the National Futures Association. FXCM has bid $110 million dollars for assets, including the RefcoFX retail accounts.

However, if there is more than one "qualified bidder," an auction would be held on January 26, 2006. A hearing to approve the sale to the winning bidder will be held at the U.S. Bankruptcy Court on January 27. If the court approves the sale, we hope the transaction will close in
February.

"We are gratified with the court's approval of the bidding procedures and look forward to completing the sale process quickly," said Robert Dangremond, Refco's chief executive officer.

Mr. Dangremond also said that any alternative bid would also need to include the assumption of Refco FX customer liabilities, providing a satisfactory outcome for Refco FX customers.

27. The claimants were looking to find more information about the bidding procedures approved by the Honorable Judge Drain on December 19, 2005, since they were aware that REFCOFX has the ability to lie to its clients.

6

28. The Claimants found on the refcodocket # 563 the order of the court about these bidding procedures approved by the Honorable judge Drain (EXHIBIT # 10).

**MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363, 365 AND 1146(c) AND FED. R. BANKR. P. 2002, 6004 AND 6006:**
**(I) AUTHORIZING THE DEBTORS IN POSSESSION TO SELL REFCO F/X ASSOCIATES, LLC's ASSETS AND EQUITY INTERESTS IN FOREX CAPITAL MARKETS, LLC;**
**(II) AUTHORIZING THE DEBTORS IN POSSESSION TOENTER INTO PURCHASE AGREEMENT;**
**(III) AUTHORIZING ASSUMPTION AND ASSIGNMENTOF CERTAIN EXECUTORY CONTRACTS RELATED THERETO;**
**(IV) APPROVING NOTICE AND BID PROCEDURES, INCLUDING BREAKUP FEE, EXPENSE REIMBURSEMENT, AND OVERBID PROTECTIONS; AND**
**(V) SCHEDULING A HEARING TO APPROVE A SALE**

29. Once again, and in fact without any big surprise, the Claimants learned the true treatment that was planned by RGL, REFCOFX and FXCM (under legal advices from Skaddens, Arp (once again)) for the "postpetition gains & losses" also called the Administrative Claims. It was very different than what was explained by REFCOFX in the December 19, 2005 email (EXHIBIT # 9).

30. We read on (EXHIBIT B of EXHIBIT 10) page 3 item 4..."RGL, RFX and FXCM recognize that (a) the result of continued trading in the Dealing Accounts in the ordinary course of business after the Petition Date may give rise to administrative expense claims pursuant to 364(a) and 503(b)(1) of the Bankruptcy Code in favor of holders of Dealing Accounts who have trading gains during the Applicable Period, (b) the amount of cash that RFX has on hand with respect to the Dealing Accounts is less than the aggregate account balances of all Dealing Accounts, (c) the ultimate recovery to holders of RFX Dealing Accounts under the bankruptcy case may be less than 100% of the amount of the Dealing Accounts as the Petition date, (d) as a result of the foregoing, holders of Dealing Accounts who trade after the Petition Date may suffer losses in an amount that is greater than the amount that they may ultimately recover under the bankruptcy case on their Petition date Dealing Account balances, and (e) as a result, the cash remaining at RFX after the termination of trading in Dealing Accounts may not be sufficient to pay all administrative expenses of the kind described in item (a) of this paragraph. To protect both, RFX customers and RFX's ability to pay its administrative claims..."

31. The Claimants acknowledge the Postpetition gains and losses treatment described on EXHIBIT B of EXHIBIT 10 page 3 item 4 and recognized by RGL, RFX and FXCM. The Claimants decided to continue trading during the Postpetition period hoping to make gains and get those gains later as administrative claims.

32. Only on June 8, 2006 REFCOFX issued an Important Notice to RefcoFX Clients (EXHIBIT 11) describing for the first time since the Prepetition date the possibility that Postpetition gains & losses should be netted against pre-bankruptcy account balances...while others (those with losses) would have their losses offset by small recoveries on pre-bankruptcy claims and might end up owning money to RFXA.

## IMPORTANT QUESTIONS & ANSWERS

33. Some important questions can be raised here, since the Ad Hoc Committee of the Refco Account Holders Legal Funds Group has requested many times to be represented on the Creditors Committee without success and furthermore asked without success REFCOFX retail clients listing for the purpose of contacting them (REFCOFX retail clients are spread worldwide) to organize a bigger and stronger group with better financial resources to defend them. In addition, REFCOFX account holders where misled (most of them) by REFCOFX emails telling them that their trading accounts would be sold and allowed them to have their money back. For those (most of them) who didn't go on the refodocket (EXHIBIT 10) to see the real REFCOFX's plan for the post-petition gains and losses treatment. They woke-up very late in the process... upon receiving Important Notice to RefcoFx clients (EXHIBIT # 11) issued on June 8, 2006 with a short time frame for them to react to the REFCOFX Chapter 11 filing.

34. Who during the Postpetition period was really taking care of the 15,000 REFCOFX Account Holders?

35. Why did REFCOFX not tell to the 15,000 REFCOFX Account Holders, the real risk of Postpetition trading losses?

36. Why has REFCOFX issued from December 19, 2005 emails without the right information and advise of the risk in continuing Postpetition trading?

37. Did the 15,000 REFCOFX Account Holders become more intelligent and able to understand the real risk of Postpetition trading only as of June 8, 2006?

38. The answer is found in EXHIBIT 10 page 14 item 25...."Because the Debtors believe that the value of their estates will be maximized through the Purchase Agreement, because the value of the Acquired Assets depends in large part on the liability of retails clients of FXA to have access to their accounts at the earliest possible time..."

39. In fact the Debtors and Creditors Committee was so greedy to maximize the selling price of the REFCOFX assets and retails client accounts for the big creditors that they were ready to hide the real risk of Postpetition trading losses to the REFCOFX account holders.

40. The Claimants and other REFCOFX account holders are (most of them) small traders with limited financial resources, left alone without any support to defend their interest. Just imagine The Claimants and other REFCOFX account holders frustration...their funds are frozen in their trading accounts, they will only recoup a small amount of their money from the REFCOFX bankruptcy, the Debtor and the Creditors Committee are using their money to earn well paid Prestigious International Law Firms against their interests...thank you very much!

8

### The Assumption and Assignment of Assumed Contracts and Assumed Leases Has been Authorized by the court...As recommended by the debtor and their Attorneys (Skadden, Arps, Slate, Meagher & Flom LLP) without objection from the creditor committee and their Attorneys

41. The following Motion for order was approved by the Honourable judge Drain (EXHIBIT # 10), under this order certain executory contracts related thereto obtained authorization assumption and assignment (see III below), the REFCOFX Client Agreements were included in these executory contracts.
MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363, 365 AND 1146(c) AND
FED. R. BANKR. P. 2002, 6004 AND 6006:
(I) AUTHORIZING THE DEBTORS IN POSSESSION TO SELL REFCO F/X ASSOCIATES, LLC's ASSETS AND EQUITY INTERESTS IN FOREX CAPITAL MARKETS, LLC;
(II) AUTHORIZING THE DEBTORS IN POSSESSION TOENTER INTO PURCHASE AGREEMENT;
(III) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS RELATED THERETO;
(IV) APPROVING NOTICE AND BID PROCEDURES, INCLUDING BREAKUP FEE, EXPENSE REIMBURSEMENT, AND OVERBID PROTECTIONS; AND
(V) SCHEDULING A HEARING TO APPROVE A SALE

42. On pages 19-20-21 item D. of this MOTION FOR ORDER (EXHIBIT # 9) we read the following information..."**The Assumption and Assignment of Assumed Contracts and Assumed Leases Should Be Authorized**" afterward we have all the reasoning as to why they should be authorized on items 35.36.37.38

43. This order included the authorization assumption and assignment of certain executory contracts (including the REFCOFX Client Agreements). That is effectively what we can conclude by reading closely the page 3 item 4. from the EXHIBIT B of EXHIBIT 10... "RGL, RFX, and FXCM recognize that (a) the result of continued trading in the Dealing Accounts in the ordinary course of business after the Petition Date may give rise to administrative expense claim..."

44. The Motion For Order describes the implication for the RefcoFX Acccount Holders if they decide to continue trading in their account after the prepetition date... We read on (EXHIBIT B of EXHIBIT 10) page 3 item 4..." RGL, RFX and FXCM recognize that (a) the result of continued trading in the Dealing Accounts in the ordinary course of business after the Petition Date may give rise to administrative expense claims pursuant 364 (a) and 503 (b)(1) of the Bankruptcy Code in favor of holders of Dealing Accounts who have trading gains during the Applicable Period, (b) the amount of cash that RFX has on hand with respect to the Dealing Accounts is less than the aggregate account balances of all Dealing Accounts, (c) the ultimate recovery to holders of RFX Dealing Accounts under the bankruptcy case may be less than 100% of the amount of the Dealing Accounts as the Petition date, (d) as a result of the foregoing, holders of Dealing Accounts who trade after the Petition Date may suffer losses in an amount that is greater than the amount that they may ultimately recover under the bankruptcy case on their Petition date Dealing Account balances...to permit payment in full of such administrative claims and such administrative claims only."

45. In fact, RGL, REFCOFX, FXCM, Creditors Committee and their Attorneys recommended to the court the assumption and assignment of the REFCOFX Client

9

Agreement as an executory contract, and the court, by an Order, authorized the assumption and assignment of the REFCOFX Client Agreements as executory contracts and allowed the REFCOFX account holders to continue trading, postpetition, in their trading accounts even if it was with tiny petition dollars from the petition date. Under this order the REFCOFX account holders trading gains and / or losses, received approval for full recovery in the case of trading gains as administrative claim and reduction of the prepetition account balances in case of trading losses occured during the postpetition trading period. These gains or losses being 100% added or reduced from their prepetition trading account balances. Gains (as per the Claimants claims) were accepted under this Order 100% payable as administrative claims. The only limitations impose to the REFCOFX Client Agreements, during the postpetition trading period, were about deposit and withdraw.

46. The Claimants received, on October 17, 2005, a Notice from REFCOFX mentioning that no more deposits or withdrawals would be accepted after the prepetition date. (EXHIBIT 6).

47. The Trustee, under the court approval, rejected the Claimants' REFCOFX Client Agreements, as executory contracts on July 31, 2006. Consequently, the Claimants' REFCOFX Client Agreements, were executory contracts from October 18, 2005 to July 30, 2006 (EXHIBIT 12).

48. The claimants refer to the **IN RE CVSA, INC.**, Case No. 91-31299 (Bankr. W.D.N.C., March 6, 1992)(J. Wooten) to support the interpretation of the Claimants about their administrative Claims - A lessor of non-residential real property that was leased to the debtor is entitled to a post-petition administrative rent claim at the monthly rental rate provided in the lease from the date of the Order for Relief until the court authorizes the trustee's rejection of the lease.

The **IN RE CVSA, INC.**, Case is the perfect reference of administrative claims allowed under an executory contract during a postpetion period until the rejection of this executory contract by the trustee and authorized by the court.

## Postpetition trading was real trading (from October 18, 2005 to July 31, 2006)

49. REFCOFX business plan states as described on its **"NOTICE OF PLAN ADMINISTRATOR'S OMNIBUS OBJECTION TO REQUESTS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS RELATED TO POST-PETITION INCREASES IN FXA CLIENT ACCOUNT BALANCES"** (EXHIBIT #13) the REFCOFX Business Plan from page 3 to pages 6 items 4 to 11.

50. We read on page 4 & 5 item 6 & 7 of the EXHIBIT 13...
Item 6...The Refco Affiliates each would serve as the counter-parties to each foreign exchange transaction made by their respective clients. Trades on the FXCM online platform did not require delivery. Consequently, client account balances represented the Refco Affiliate's liability to the client, but did not reflect currencies or investments that Refco Affiliate actually held."

10

Item 7..."For example, if a client deposited funds in U.S. dollars to its account, the Refco Affiliate would have a liability to the client in an amount equal to the deposit. If the client then bought and sold Japanese yen, and made a profit on the trade, the Refco Affiliate's U.S. dollar liability to the client would increase. Conversely, if the client lost money on its trade, the Refco Affiliate's U.S. dollar obligation to the client would decrease. Throughout the client's trading, the Refco Affiliate would not actually buy and sell Japanese yen in the open market from a third party each time its client "bought" and "sold" yen. Rather, it would, in its discretion, sometimes hedge all or part of its exposure to clients. Sometimes it would not. The Refco Affiliate generated its profit, if any, to the extent that aggregate client losses exceeded aggregate client gains, net of any hedging activity engaged in by the Refco Affiliate".

51. Once again we don't have a complete explanation from the other party. Bingham McCutchen LLP, Attorney for the Plan Administrator, neglects to mention that the Refco Affiliate also generated profit from the trading spread.

52. REFCOFX (RFX), RGL and FXCM confirm that REFCOFX account holders were making real trading on Postpetition date. See EXHIBIT B of EXHIBIT 10 page 3 item 4 we read....(a) the result of continued trading in the Dealing Accounts in the ordinary course of business after the Petition Date.

53. In addition Mr. Drew Niv (FXCM CEO) offered the following explanation to some Refco Account Holders Legal Funds Group members for the mid-May spread increase:" Ever since the bankruptcy process started, Refco has disabled all bank counterparty lines and therefore there is no ability to offset positions (make some hedging) in the market, as the market is now more volatile and there is no way to offset risk, spreads must be increased to compensate for increased volatility which was not present in the months prior. Refco's only way to deal with risk is warehouse it and hope that internal liquidity offsets a chunk of it, higher spreads make that more likely and reduces margin of error. Obviously if the RefcoFX entity was functioning normally there would be bank facilities available and all this would not be necessary".

54. From a second source, we have confirmation that REFCOFX account holders who traded during the post-petition period were making real trading on REFCOFX platform even if REFCOFX were no longer able to make any hedging activity.

55. REFCOFX business plan stays the same before and after prepetition date. In fact it always been paper trading. We read, from document provided by Bingham McCutchen LLP, attorneys for the Plan Administrator, EXHIBIT 13 page 4 & 5 Item 6...The Refco Affiliates each would serve as the counter-parties to each foreign exchange transaction made by their respective clients. Trades on the FXCM online platform did not require delivery. Consequently, client account balances represented the Refco Affiliate's liability to the client, but did not reflect currencies or investments that Refco Affiliate actually held." That is exactly what we call paper trading. Paper trading as been before and after prepetion date the RECFOFX' core business and the real delivery was the change in the Refco Affiliate's liability to the client.

56. When the Honorable judge Drain stated at the hearing on April 11, 2007 that REFCOFX accounts holders were trading only with tiny bankruptcy dollars (somewhere between 10 and 38 cents according to the disclosure statement), he was

11

right, but we need to clarify the following point, the Claimants and many others REFCOFX account holders traders as well, needed or used maximum +/- 15% of the account balance equity as maintenance margin to trade, either for the Prepetion trading or Prepetition trading.

57. Based on the previous statements it is clear that the Claimants were making real trading during the Postpetion period.

58. Conclusion: REFCOFX continued trading, as per its prepetition business plan, in the Dealing Accounts in the ordinary course of business during the Post-petition period and, when needed, replace hedging activity by increasing the spreads.

59. Based on the previous statements, the Claimants allege, that they and other REFCOFX account holders as well, received wrongful or partial information from REFCOFX, REFCOFX's Attorneys, Creditors Committee, Plan Administrator Attorneys, with the intent to mislead them and bring them, including the court, to believe that no real trading occurred during the post-petition period.

### The two-part McFarland's test

### First requirement

60. Based on previous statements, documents and argumentation, the Claimants allege that their administrative claims meet the first requirement of the McFarland's test... "The claim must arise out a postpetition transaction between the Claimants and the estate". It is clear, under the previous information brought to the court by this Appeal that the Claimants made real trading during the post-petition period.

### Second requirement

61. Based on previous and following statement, the Claimants allege that their administrative claims meet also the second requirement of the McFarland's test..."the consideration supporting the claim is both supplied to, and beneficial in a direct way to the debtor in possession and the operation of the business."

### First benefit in a direct way for the debtor in possession and the operation of the business

62. On page 7 item 13 of EXHIBIT 10 we can read the following ..." Thus, maintenance of the RefcoFX Customer Accounts at FXA is essential not only for maximizing value of FXA, but also for maximizing the value of Group's 35% interest in FXCM."

63. Despite the fact that REFCOFX Customer Accounts were not sold to FXCM or to another bidder, by the previous statement, the Debtor clearly indicates and recognizes in the previous statement (page 7 item 13 of EXHIBIT 10) that the maintenance of the RefcoFX Customer Accounts was beneficial in a direct way. The Claimants should not

12

be deprived of their administrative claims even if the Creditors Committee decided to oppose the sale of the RefcoFX Customer Accounts to FXCM or other bidders. By continuing to trade in their RefcoFX Customer Accounts, the Claimants maintain that for a certain period of time this maximized not only the value of FXA, but also maximized the value of the Group's 35% interest in FXCM until rejection of the executory contracts, being the REFCO Client Agreements, in our case, this rejection being made on July 30, 2006 (EXHIBIT 11-12).

**Second benefit in a direct way for the debtor in possession and the operation of the business**

64. The Claimants allege there were changes in REFCOFX liabilities against REFCOFX account holders, which could only come from postpetition trading. Moreover, during the postpetition period REFCOFX made substantial net profits as a result of these business activities which led to an overall decline in net liabilities against REFCOFX account holders.

65. Since much of the information issued to the intend of the REFCOFX account holders by REFCOFX, Creditor Committee and their Attorneys, were often either incomplete or false in the past, we respectfully ask the court to obtain from REFCOFX the monthly financial REFCOFX statements for each month of the postpetition trading period to confirm the total REFCOFX liabilities against REFCOFX account holders based on the REFCOFX account holders' balances on prepetition date (October 17, 2005) and the total REFCOFX liabilities against REFCOFX account holders at the end of the postpetition period ending on July 30, 2006 as per the REFCOFX account holders balances at this ending date.

66. The Claimants allege that an important reduction in the total REFCOFX liabilities against REFCOFX account holders occurred during the postpetition period; REFCOFX account holders trading brought postpetition profit to the Debtor. These profits are supplied to, and beneficial in a direct way to the debtor in possession and the operation of the business." The monthly financial REFCOFX statements for each month of the postpetition trading period will confirm the Claimants allegation of the REFCOFX profits for the postpetition period.

**Third benefit in a direct way for the debtor in possession and the operation of the business**

67. REFCOFX account holders list has been sold for $750,000 on or around December 12th 2006 as reported in the Latin America Troubled Company Reporter and elsewhere:
http://bankrupt.com/TCRLA_Public/061212.mbx REFCO INC: GAIN Capital Wins FXA's Customer List for $750,000 usd. This may be may be considered a small sum but there is no requirement in law that benefits received be commensurate with claims made. The mere existence of this single post-petition benefit could validate all claims in respect of the benefit test under <u>McFarland's</u> test.

13

WHEREFORE, considering the fact that The REFCO CLIENT AGREEMENT has been an executory contract between 9016-2355 Québec inc. and REFCOFX (FXA) from October 18, 2005 to July 31, 2006, 9016-2355 Québec inc. respectfully requests that this Court order to the Plan Administrator to pay 9016-2355 Québec inc. the full value of its ADMINISTRATIVE CLAIM $ 17,524.49 immediately.

Signed: 9016-2355 Québec Inc. / René Bilodeau

Dated: May 9, 2007, Boucherville, Canada


**Calculation for the ADMINISTRATIVE CLAIM**

9016-2355 Québec inc. account balance on July 31 2006: 61,362.84$
-
9016-2355 Québec inc. account balance on October 17 2005: 43,838.35$
=
Gain / Profit (Administrative Claim): 17,524.49$

15